**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TOMÁS DE'MEDICI, TdM EMERALD CORP., and ION STEWARDS ENERGY,<br><br>Plaintiffs,<br><br>v.<br><br>JASON BECK, ADVANCED STRATEGIES LLC, and SOLARGATOR LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>**JURY DEMAND** |

# COMPLAINT

Plaintiffs Tomás de'Medici, TdM Emerald Corp. and Ion Stewards Energy, for their complaint against defendants Jason Beck, Advanced Strategies LLC and SolarGator LLC, hereby allege as follows:

## Introduction

1. Mr. de'Medici has devoted nearly a decade of his professional life to bringing clean energy to communities throughout Illinois. After completing his college education and seeking out every opportunity available to gain hands-on experience in practical sustainability, which included working in public policy, greywater hauling, urban farming, operations, political organizing and startup business development, Mr. de'Medici took his extensive and comprehensive knowledge and skills to multiple clean energy firms. His vision, experience and wealth of knowledge was instrumental in supporting these firms to successfully bring solar energy to communities in over ten Illinois counties, as well as energy efficiency projects that served commercial, industrial, and municipal ratepayers throughout the State.

2. Over time, Mr. de'Medici earned respect and awareness from clean energy industry professionals and associations for his work. In 2023, Mr. de'Medici was nominated to participate in the Energy Leadership Institute's 2024 EnGen cohort. The cohort is an exclusive, one-year executive leadership development program offered only to those who are recognized as leaders within the energy industry and are committed to pursuing a long-term career in the energy field. Mr. de'Medici was honored to be nominated, and in 2024, he participated in the program.

3. It was through the EnGen program that Mr. de'Medici first met defendant Jason Beck. Like others in the energy industry, Beck quickly recognized Mr. de'Medici as a rising star and as an individual with a successful and lucrative career ahead of him. But Beck also saw something else in Mr. de'Medici: an opportunity for Beck, himself, to make a profit.

4. Beck approached Mr. de'Medici during the EnGen program and told Mr. de'Medici about a supposed opportunity. Beck said that he, through his advisory firm, Advanced Strategies LLC ("Advanced Strategies"), could help Mr. de'Medici secure $500,000 in funding to pursue a startup venture in the clean energy space. Beck further expressed interest in partnering with Mr. de'Medici as an advisor whose primary role would be to secure funding for Mr. de'Medici.

5. Mr. de'Medici was initially optimistic about partnering with Beck—but before doing so, he asked Beck to sign a non-disclosure agreement that would prohibit Beck from disclosing the wealth of ideas and industry knowledge Mr. de'Medici had acquired over years of experience in the clean energy arena. Beck obliged.

6. Beck insisted that it was absolutely essential that Mr. de'Medici share with him detailed decks, business strategy, financial projections, branding materials, research and other information Mr. de'Medici had developed over nearly a decade of working in the clean energy space in order for Beck to secure the funding he had promised. These decks were not materials

from former employers, but rather consisted of Mr. de'Medici's own unique work and ideas. Mr. de'Medici shared this information because he trusted Beck and believed Beck was working with him, not looking to compete against him. Mr. de'Medici later learned that he was wrong.

7. After several months of sharing his proprietary plans and materials, introducing Beck to numerous professionals and potential investors with whom Mr. de'Medici had worked for years to foster and maintain, and ultimately quitting his job—at Beck's recommendation—to fully commit to building the solar energy company he had long envisioned and demonstrate authentic commitment to Beck's investment, Mr. de'Medici began to realize that the promises Beck had made were not materializing. Chief among these was Beck's promise to provide Mr. de'Medici with $500,000 in startup capital. Beck had assured Mr. de'Medici that the capital was forthcoming, and that it was essential that Mr. de'Medici continue sharing detailed business strategies with Beck so that Beck could continue securing funding. Mr. de'Medici gave Beck the information, but Beck gave him nothing in return.

8. In August 2024, the reason why became clear: Beck had been using Mr. de'Medici's proprietary ideas, information, strategy and plans to develop his **own** solar energy startup firm, SolarGator.

9. Though it was initially borne from the extensive proprietary information Mr. de'Medici shared with Beck, SolarGator has been built on business practices and ethics that could not be further from those Mr. de'Medici embodies and was actively striving to implement in his own solar energy startup. [redacted].

[redacted]

10. But Beck had different plans. Rather than adhering to the rules and regulations about which Mr. de'Medici had educated him, never knowing that Beck was using this information for his own enrichment, Beck instead used confidential credit card holder information he had obtained while working for a large bank to target low-to-moderate income individuals through SolarGator. Beck revealed to Mr. de'Medici that he intended to leverage this information to reduce customer acquisition costs, undercut the market, and enter into profitable deals with third-party solar project development firms. Mr. de'Medici was deeply troubled by this revelation and urged Beck to consider the legality and ethics of this approach.

11. Beck dismissed Mr. de'Medici's concerns. In December 2024, it was publicly announced that Solar Landscape, one of the largest providers of rooftop solar power in the United States, had obtained $847 million in investor funding to re-enter the Illinois solar energy market after years of failed attempts to get solar projects in Illinois off the ground. Public records—and Beck's own statements to Mr. de'Medici—show that SolarGator, with Beck at the helm, worked with Solar Landscape in the fall of 2024 during the lead-up to Solar Landscape's funding announcement. The announcement and evidence showing that SolarGator and Solar Landscape collaborated only after Mr. de'Medici had shared his wealth of knowledge with Beck made clear to Mr. de'Medici that Beck had not only used Mr. de'Medici's proprietary knowledge about the solar energy industry for his own financial gain, but to enrich others as well.

12. Today, the solar energy startup Mr. de'Medici worked tirelessly to create finally exists. But it is owned by Jason Beck, who built SolarGator from proprietary information he stole from Mr. de'Medici to create what he would later admit to being his own "stealth start-up." This is an action to hold Beck accountable for stealing Mr. de'Medici's trade secrets, perverting Mr. de'Medici's professional ethos, and defying solar industry rules and regulations.

## Jurisdiction and Venue

13. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

14. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims at issue in this matter occurred in this District.

## Parties

17. Plaintiff Tomás de'Medici is an individual and a citizen of Illinois.

18. Plaintiff TdM Emerald Corp. ("Emerald") was a corporation incorporated in Illinois with its principal place of business in Illinois. Emerald was dissolved on August 8, 2025.

19. Plaintiff Ion Stewards Energy Inc. ("Ion") is a corporation incorporated in Wyoming with its principal place of business in Illinois.

20. Defendant Jason Beck is an individual and a citizen of Texas.

21. Defendant Advanced Strategies LLC ("Advanced Strategies") is a Texas limited liability company. Upon information and belief, Jason Beck is the sole member of Advanced Strategies and is a citizen of Texas.

22. Defendant SolarGator LLC is a Delaware limited liability company with its principal place of business in Connecticut. Upon information and belief, Jason Beck and Joel Berntsen are the sole members of SolarGator. Upon information and belief, Beck is a citizen of Texas and Berntsen is a citizen of Connecticut.

## Factual Background

23. Mr. de'Medici began acquiring the unique set of skills that would later lead to his success in the energy field when he was in middle and high school. During these early years, he interned with a photojournalist, helping to cover sensitive topics like the human impacts of extreme weather on low-moderate income areas; political campaigns; and poverty in America across diverse communities. While a student at Trinity College, Mr. de'Medici studied urban and global studies, and he was also actively involved in his university's student government. Mr. de'Medici graduated from Trinity College in 2011.

24. After college, Mr. de'Medici worked a number of jobs that continued to give him the skills necessary and expertise that would ultimately be necessary for creating his own successful solar energy firm. For example, Mr. de'Medici worked at a greywater hauling firm, where he materially improved the facility's annualized revenue, sales models and marketing models. He worked on a political campaign, where he delivered pitches to thousands of voters, organized and led meetings, and managed teams to expand the electorate through voter registration. He later worked at various consulting firms, where he researched market intelligence,

drafted requests for proposals, managed marketing campaigns, and developed comprehensive business and engagement strategies.

25. In April 2017, Mr. de'Medici became a consultant, and then an analyst, at Trajectory Energy Partners ("Trajectory"). Trajectory is a solar energy firm that has developed solar energy in communities across Illinois and beyond. As an early-stage employee, Mr. de'Medici had a unique opportunity to learn best practices and gain foundational experience across multiple components of solar project development. While at Trajectory, Mr. de'Medici played a critical role in helping the company achieve early success.

26. As a consultant for Trajectory, Mr. de'Medici developed physical and digital branding, as well as marketing assets, which involved hands-on rooftop assessments, policy research, stakeholder engagement, strategy development and analysis and early-stage solar project development-related tasks. As an analyst, Mr. de'Medici provided critical guidance about policy changes, new markets, government and landowner relations, community engagement and drafting program applications. He also played a key role in securing over $5 million in funding for Rockford Solar, a community solar project that has provided utility savings to residents with low-moderate incomes in Rockford, Illinois, and throughout the ComEd service territory. This opportunity provided a meaningful environment from which to both learn and contribute.

27. After Trajectory, Mr. de'Medici transitioned to the role of Outreach Specialist at Resource Innovations, a multi-service energy firm providing research and advisory services, technological solutions, software analytics and more to various players in the clean energy space. While at Resource Innovations, Mr. de'Medici continued to acquire firsthand knowledge, skills and professional contacts that contributed to his robust knowledge of the clean energy industry. For example, Mr. de'Medici developed and implemented an effective sales and business

development model to successfully secure significant clients into ComEd's Energy Efficiency Program. He also provided advice on key accounts, which led to paid incentives and savings opportunities.

28. In December 2022, Mr. de'Medici moved to Reactivate, a renewable energy company that develops, owns and operates renewable energy solutions across the country. Reactivate specifically focuses on community solar, small-scale utility and next generation energy projects. From December 2022 to July 2024, Mr. de'Medici served as a community solar product manager at Reactivate. In that role, he supported multiple teams to synthesize different solar and clean energy project development requirements and best practices across the Midwest and Central South regions.

29. In late 2023, Mr. de'Medici was nominated for and accepted into the Energy Leadership Institute's 2024 EnGen cohort. The EnGen program is a 10-month-long program for individuals with at least eight years of experience in the energy sector who have been identified as a leader within the energy industry. Participants must be interested in pursuing a long-term career in energy, they must demonstrate a passion for solving complexities of the energy ecosystem, and they must demonstrate a commitment to and engagement within the energy industry and their communities. Because of his years of experience in the clean energy space, as well as his entrepreneurial spirit and dedication to serving his community, Mr. de'Medici was an ideal candidate for the EnGen program.

30. While participating in the program, Mr. de'Medici discussed his interest in starting his own (not yet named) solar firm ("<u>TDM Solar Venture</u>"). [redacted]

[redacted] It was this very same understanding and knowledge that Mr. de'Medici had previously relied on while at Trajectory, Resource Innovations and Reactivate to successfully develop and implement strategies to get solar energy and clean energy projects built, despite the political and economic climate that posed a significant barrier for other solar energy developers. The key to the success of the TDM Solar Venture would therefore be Mr. de'Medici's unique and proprietary knowledge of every facet of the community solar and distributed generation landscape.

31. Additionally, the TDM Solar Venture would enjoy the benefit of Mr. de'Medici's deep knowledge of the regulatory landscape in Illinois, which gave him a critical advantage relative to other solar energy developers. [redacted] It was this knowledge and strategy that would ultimately allow the TDM Solar Venture to be the first in the market prepared to offer a solution to impacted communities.

32. It was during the EnGen program when Mr. de'Medici met Jason Beck, another participant in the program, for the first time. Though Beck had spent a portion of his career working in the energy and gas fields, he did not have significant experience working in the solar or community solar spaces like Mr. de'Medici. Similarly, though Beck had spent some time working at energy companies based in Illinois, he had spent a majority of his career working outside of Illinois and on projects in other markets.

33. During the EnGen program, Beck approached Mr. de'Medici and told Mr. de'Medici that he thought the TDM Solar Venture sounded promising, and as a fellow entrepreneur, he was interested in helping Mr. de'Medici get the project off the ground. Beck told Mr. de'Medici that Beck had access to capital, and he was confident he could secure $500,000 in funding for Mr. de'Medici.

34. Like any entrepreneur, Mr. de'Medici recognized that capital was essential for the success of the TDM Solar Venture. He therefore began seriously considering working with Beck to obtain the capital Beck had promised. Before agreeing to provide Beck with any specific, proprietary and confidential information about the TDM Solar Venture, however, Mr. de'Medici asked that Beck sign a comprehensive non-disclosure agreement ("NDA"). *See* **Exhibit 1.** The overall purpose of the NDA was to limit the disclosure and use of confidential information that Mr. de'Medici and his corporate entity, Emerald, would be sharing with Beck.

35. The NDA defines "confidential information" as any data or information that is proprietary to Emerald and Mr. de'Medici and not generally known to the public, including, but not limited to: (i) any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans, and performance results relating to the past, present or future business activities of such party, its affiliates, subsidiaries, and affiliated companies; (ii) plans for

products or services, and customer or supplier lists; (iii) any scientific or technical information, invention, design, process, procedure, formula, improvement, technology, or method; (iv) any concepts, reports, data, know-how, works-in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information, and trade secrets; (v) any other information that should reasonably be recognized as confidential information of Emerald and Mr. de'Medici; and (vi) any information generated by Beck or Advanced Strategies or by their representatives that adapts, is created from, contains, is derived from, improves, modifies, reflects, relates to, varies from, or in any manner originated out of or from the confidential information, in whole or in part, or is derived from any of the foregoing**.** *See* Ex. 1 § 1.1.

36. Among other things, the NDA limits Beck's ability to disclose confidential information about the solar energy startup to other third-parties and prohibits Beck from using any confidential information he obtained for any other purpose other than assisting Mr. de'Medici and Emerald with securing the promised funding for the TDM Solar Venture. *Id.* § 2. Beck executed the NDA on April 29, 2024.

37. After Beck executed the NDA, from April to August 2024, Mr. de'Medici began sharing detailed business plans, financial projections, business strategies and professional contact information with Beck. Beck told Mr. de'Medici that it was necessary that Mr. de'Medici provide this information to Beck so that Beck could refine it and help Mr. de'Medici tailor it to specific investors.

38. Among other things, Mr. de'Medici shared the following information with Beck:

a. [redacted]

[redacted]

b. [redacted]

[redacted] [redacted]

[redacted] [redacted]

e. [redacted]

[redacted] [redacted]

[redacted] [redacted]

h. and more (collectively, the "<u>Trade Secrets</u>").

39. Not only did Mr. de'Medici discuss the Trade Secrets in Zoom calls, phone calls, text messages and emails, but Mr. de'Medici also repeatedly emailed Beck detailed,

comprehensive decks that outlined the entire TDM Solar Venture business strategy, which Beck insisted was necessary to obtain funding for Mr. de'Medici.

40. The Trade Secrets Mr. de'Medici shared with Beck—all in the belief that Beck was using that information solely for the purpose of helping Mr. de'Medici secure half a million dollars for the TDM Solar Venture and in accordance with Beck's obligations under the NDA—had been developed, compiled or accumulated throughout Mr. de'Medici's over two decades of experience in the startup, clean energy, public policy, political action, community organizing and urban planning spaces across multiple countries. The Trade Secrets are not readily accessible to people outside the solar energy field and derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from them.

41. Both Mr. de'Medici and Beck acknowledged the proprietary and confidential nature of the Trade Secrets when they signed the NDA, which states that the receiving party acknowledges that the confidential information subject to the NDA is proprietary to Mr. de'Medici and Emerald and was developed and obtained through great efforts by Mr. de'Medici and Emerald. *Id.* §§ 1, 6.

42. Indeed, in recognition of the value of the Trade Secrets, Mr. de'Medici would not share them with Beck unless and until Beck signed the NDA. Nor would Mr. de'Medici share the Trade Secrets with other individuals to whom Beck introduced him—ostensibly in furtherance of helping Mr. de'Medici build the TDM Solar Venture—unless and until those individuals also signed a non-disclosure agreement.

43. While sharing the Trade Secrets with Beck, Mr. de'Medici also actively continued to build the TDM Solar Venture. He incorporated a new entity, Ion Stewards Energy ("<u>Ion</u>"), which

would be a subsidiary of Emerald and the vehicle for the Illinois-specific sector of the overall TDM Solar Venture. Mr. de'Medici worked with a designer to begin to prepare a website, branding and marketing materials. Mr. de'Medici also continued to build a team of partners with relevant industry experience.

44. All the while, Beck continued to mine Mr. de'Medici for more Trade Secrets. In addition to collecting detailed, proprietary information from Mr. de'Medici under the pretense that it was required for Beck to obtain funding from investors, Beck also routinely asked Mr. de'Medici to provide additional information and advice to Beck about solar energy-related market research. Beck asked Mr. de'Medici to educate him about various facets of the Illinois solar energy market and related issues, in particular, admitting to Mr. de'Medici on at least one occasion that the information was not for the TDM Solar Venture, but rather was for Beck's own personal use.

45. Indeed, the multiple decks and draft decks Mr. de'Medici provided to Beck included [redacted] In short, the decks provided Beck with everything Beck would need—and, upon information and belief, later used—to pitch a solar venture that was new and unique to the existing market.

46. In early July 2024, after months of compiling the wealth of knowledge and skills it had taken Mr. de'Medici years to accumulate, Beck told Mr. de'Medici that Beck had obtained a verbal commitment from Savant Energy Services ("Savant Energy") to provide Mr. de'Medici

with $500,000 in funding for the TDM Solar Venture. Beck further told Mr. de'Medici that Mr. de'Medici should quit his job at Reactivate in order to demonstrate his commitment to the TDM Solar Venture and to finalize the funding Beck had allegedly been spending months trying to obtain. Beck promised Mr. de'Medici that the $500,000 from Savant Energy was a near-certainty, and the only thing remaining to secure it was for Mr. de'Medici to meet the Savant Energy principals. Relying on Beck's promise, Mr. de'Medici quit his job at Reactivate on July 15, 2024.

47. But the funding Beck had long promised never came.

48. In late July 2024, Mr. de'Medici and Beck had a Zoom call. It was during that call when Beck first revealed details about his own solar venture he had apparently been building behind the scenes, SolarGator LLC ("SolarGator"). This was a surprise to Mr. de'Medici, who had been sharing his own knowledge of the solar industry and detailed business plans for a similar venture with Beck for many months.

49. During that call, Beck also revealed his plan to use confidential, personally identifiable information cardholder information he had obtained during his work as a sub-contractor at a national bank in order to target residents with low-to-moderate income for SolarGator. Though Mr. de'Medici had no involvement in SolarGator, he was deeply troubled by this revelation and expressed his concerns about the legality and propriety of Beck using cardholder information in this way.

50. It was around this same time when Beck told Mr. de'Medici—to Mr. de'Medici's further surprise—that Beck had been in contact with the owner of Solar Landscape, one of the nation's leading commercial rooftop solar developers, about Solar Landscape's re-entry into the Illinois market. Beck said that he was close friends with Solar Landscape's CEO, and he also

indicated that he was trying to help a family friend, Bobby Solomon, obtain employment at Solar Landscape, even though Mr. Solomon had no previous experience in solar energy.

51. Mr. de'Medici was familiar with Solar Landscape. In fact, Mr. de'Medici had previously engaged in serious discussions with Solar Landscape about joining their team, but the discussions fell apart because of racially-motivated comments made by certain individuals at Solar Landscape to and about Mr. de'Medici.

52. Mr. de'Medici also knew that Solar Landscape had effectively exited the Illinois marketplace after multiple failed attempts to have proposals for community solar projects approved by the Illinois Power Agency and other regulatory bodies.

53. Beck's newfound revelations about the development of SolarGator, his insider knowledge about Solar Landscape's plan to re-enter the Illinois market and his questionable business ethics caused Mr. de'Medici to question and ultimately terminate his working relationship with Beck. Over the course of several months, Beck had failed to acquire the funding he promised for Mr. de'Medici. Worse yet, Beck had obtained nearly every piece of information necessary to start his own solar venture through the decks and Trade Secrets Mr. de'Medici had shared with him. Mr. de'Medici began to fear that he had been duped, and Beck's goal was never to help him launch the TDM Solar Venture after all.

54. By the end of August 2024, Mr. de'Medici stopped communicating with Beck about the TDM Solar Venture.

55. Within a month, on September 9, 2024, Beck emailed Illinois Shines, a state-administered solar program providing incentives for the development of qualified solar projects, to inquire about a "repository of project developer information that state programs in Illinois have approved." *See* **Exhibit 2.** Beck went on to tell Illinois Shines that he would be happy to meet with

them to "share more about this ***stealth start-up***" he was kicking off with pilot programs in New Jersey and Illinois in January 2025. *Id.* (emphasis added).

56. In September 2024, Bobby Solomon, Beck's friend, was hired by Solar Landscape to be Director of Business Development—a similar role (without the same technical and policy skill set required) to what Solar Landscape had offered Mr. de'Medici in 2022 before negotiations broke down in light of the firm's disparaging comments to Mr. de'Medici.

57. On September 18, 2024, Illinois Shines was scheduled to have a meeting with SolarGator. The meeting invite describes SolarGator as "a new subscriber acquisition firm looking to enter the IL market. They are planning to work with Solar Landscape and other [Approved Vendors] on pilot projects." *See* **Exhibit 3.**

58. In other words, over the course of four months, Beck concealed from Mr. de'Medici that he had been developing SolarGator—a "stealth start-up"—and that he had been developing a partnership with Solar Landscape, a national leader in solar development, to create a subscriber acquisition firm in the Illinois market. Beck was somehow doing this despite having almost no relevant solar experience in the Illinois market, and upon information and belief, his sole knowledge of the market came directly from Mr. de'Medici and the Trade Secrets he had shared.

59. SolarGator was officially incorporated in the State of Delaware on October 21, 2024

60. On October 28, 2024, Mr. de'Medici, through counsel, sent a cease and desist to Beck and parties Beck had represented as receiving information about or becoming aware of the TDM Solar Venture. The cease and desist letters requested preservation and return of all materials. *See* **Exhibit 4.**

61. Beck responded to the letter by denying that he had breached his confidentiality obligations. *See* **Exhibit 5.** Jeremy Gutierrez, Managing Partner at Savant Energy, responded to the letter by stating that the claims had no relevance to Savant Energy. *See* **Exhibit 6.**

62. On December 16, 2024, Joel Berntsen certified himself as the Managing Member of Solar Gator LLC under New Jersey's Clean Energy Program as a Community Solar Subscriber Organization. Throughout their correspondences about the TDM Solar Venture, Beck had recommended that Mr. de'Medici meet Berntsen, a member of Beck's network whom Beck characterized as a potential future partner of the TDM Solar Venture. Upon information and belief, Beck had intended for Berntsen to facilitate the extraction of Trade Secrets from Mr. de'Medici in furtherance of helping Beck eventually create SolarGator.

63. In December 2024, it was publicly announced that Solar Landscape had secured **$847 million** in funding and deals from ten separate investors to pursue the development of community solar projects across the State of Illinois and Maryland. *See* **Exhibit 7.** This was despite the fact that Solar Landscape had previously repeatedly failed to effectively obtain the appropriate regulatory approval for solar development in Illinois and had effectively left the market before Beck and Solomon began working with Solar Landscape in 2024—the same time Beck had been systematically collecting and exploiting Mr. de'Medici's Trade Secrets.

64. Upon information and belief, Beck had never approached Mr. de'Medici at the EnGen program for the purpose of helping Mr. de'Medici obtain funding for and successfully build the TDM Solar Venture. Beck approached Mr. de'Medici because Mr. de'Medici had something Beck needed: knowledge. Over the course of months, Mr. de'Medici shared that knowledge—the Trade Secrets—with Beck, and Beck monetized those Trade Secrets for himself by forming SolarGator and partnering with Solar Landscape. Upon information and belief, Beck revealed and

utilized the Trade Secrets to build SolarGator and to work with Solar Landscape behind the scenes to obtain project funding Solar Landscape had not previously successfully obtained.

65. Additionally, upon information and belief, Beck input the Trade Secrets into artificial intelligence and large language models without Mr. de'Medici's consent. Since these models incorporate their inputs into future outputs, Beck's actions of feeding the Trade Secrets to these models further diluted the value of the Trade Secrets.

66. Mr. de'Medici would not have shared the Trade Secrets with Beck had he known of Beck's true intentions to not only steal Mr. de'Medici's Trade Secrets, but also to use them in a manner so contradictory to Mr. de'Medici's intentions.

67. SolarGator incorporated in Illinois on April 22, 2026. *See* **Exhibit 8.** Beck remains a manager of SolarGator, which Beck himself describes as a "community solar enrollment platform that aggregates subscriber demand for developers . . . through scalable digital marketing and partnerships with high-trust brands reaching over 30 million energy customers across the U.S." *Id. See also* **Exhibit 9.**

68. As of July 2026, Solar Landscape has continued to expand into Illinois with additional job listings, such as "Community & Municipal Engagement Manager – Community Solar (Illinois)." This role is in line with the recommendations Beck acquired from Mr. de'Medici and provided to Solar Landscape as part of their reentry into Illinois.

69. Today, Mr. de'Medici, through Ion, continues to pursue the solar venture he originally envisioned and disclosed to Beck. [redacted]

**COUNT I: VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 (All Defendants)**

70. Plaintiffs re-state and re-allege paragraphs 1 through 68 as if fully set forth herein.

71. The Trade Secrets consist of financial, business, scientific, technical and economic information, including plans, compilations, designs, methods, techniques, processes and procedures, that Plaintiffs have taken reasonable measures to keep secret.

72. The Trade Secrets derive independent economic value by not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the Trade Secrets.

73. The Trade Secrets are related to a product or service used in or intended for use in interstate or foreign commerce, within the meaning of 18 U.S.C. § 1832(a). Specifically, the Trade Secrets are related to solar energy programs intended for use in interstate commerce.

74. Defendants misappropriated the Trade Secrets. Specifically, Defendants disclosed and used the Trade Secrets without express or implied consent and, at the time of disclosure or use, knew they had acquired the Trade Secrets under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets or limit the use of the Trade Secrets.

75. Defendants intended to convert the Trade Secrets to their own economic benefit and to the economic benefit of Solar Landscape and SolarGator and knew that converting the Trade Secrets would injure their owners, Plaintiffs.

76. Defendants, without authorization, obtained the Trade Secrets by deception. Specifically, Defendants promised Plaintiffs that Defendants could and would secure half a million dollars in funding for the TDM Solar Venture, and told Plaintiffs that Plaintiffs needed to share the Trade Secrets with Defendants in order to receive such funding.

77. After obtaining the Trade Secrets by deceptive means, Defendants used the Trade Secrets to develop their own solar venture, SolarGator. Upon information and belief, Defendants also used the Trade Secrets to assist Solar Landscape in obtaining over $847 million in funding for solar energy projects throughout the United States.

78. Defendants' misappropriation of the Trade Secrets was willful and malicious.

79. As a direct and proximate result of Defendants' misappropriation and theft of the Trade Secrets, Plaintiffs have incurred significant financial damages.

WHEREFORE, Plaintiffs pray that a judgment be entered in their favor and against Defendants, and that the Court issue an award of: (a) compensatory damages in an amount to be proven at trial; (b) exemplary damages; (c) punitive damages; (d) attorneys' fees; (e) a permanent injunction preventing further use and distribution of the Trade Secrets in whole or in part; and (f) any further and additional relief the Court deems to be proper and just.

**COUNT II: VIOLATION OF THE ILLINOIS UNIFORM TRADE SECRETS ACT, 765 ILCS 1065/1 *et seq.* (All Defendants)**

80. Plaintiffs re-state and re-allege paragraphs 1 through 68 as if fully set forth herein.

81. The Trade Secrets consist of financial, business, scientific, technical and economic information, including plans, compilations, designs, methods, techniques, processes and procedures, that Plaintiffs have taken reasonable measures to keep secret.

82. The Trade Secrets are sufficiently secret such that they derive independent economic value by not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the Trade Secrets.

83. Defendants misappropriated the Trade Secrets. Specifically, Defendants disclosed and used the Trade Secrets without express or implied consent and, at the time of disclosure or use,

knew they had acquired the Trade Secrets under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets or limit the use of the Trade Secrets.

84. Defendants intended to convert the Trade Secrets to their own economic benefit and to the economic benefit of Solar Landscape and SolarGator and knew that converting the Trade Secrets would injure their owners, Plaintiffs.

85. Defendants, without authorization, obtained the Trade Secrets by deception. Specifically, Defendants promised Plaintiffs that Defendants could and would secure half a million dollars in funding for the TDM Solar Venture, and told Plaintiffs that Plaintiffs needed to share the Trade Secrets with Defendants in order to receive such funding.

86. After obtaining the Trade Secrets by deceptive means, Defendants used the Trade Secrets to develop their own solar venture, SolarGator. Upon information and belief, Defendants also used the Trade Secrets to assist Solar Landscape in obtaining over $847 million in funding for solar energy projects throughout the United States.

87. Defendants' misappropriation of the Trade Secrets was willful and malicious.

88. As a direct and proximate result of Defendants' misappropriation and theft of the Trade Secrets, Plaintiffs have incurred significant financial damages.

WHEREFORE, Plaintiffs pray that a judgment be entered in their favor and against Defendants, and that the Court issue an award of: (a) compensatory damages in an amount to be proven at trial; (b) exemplary damages; (c) punitive damages; (d) attorneys' fees; (e) a permanent injunction preventing further use and distribution of the Trade Secrets in whole or in part; and (f) any further and additional relief the Court deems to be proper and just.

## COUNT III: BREACH OF CONTRACT
## (Beck, Advanced Strategies)

89. Plaintiffs re-state and re-allege paragraphs 1 through 68 as if fully set forth herein.

90. The NDA is a valid and enforceable contract between Mr. de'Medici, Emerald, Beck and Advanced Strategies.

91. The NDA defines "confidential information" as any data or information that is proprietary to Emerald and Mr. de'Medici and not generally known to the public, including, but not limited to: (i) any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans, and performance results relating to the past, present or future business activities of such party, its affiliates, subsidiaries, and affiliated companies; (ii) plans for products or services, and customer or supplier lists; (iii) any scientific or technical information, invention, design, process, procedure, formula, improvement, technology, or method; (iv) any concepts, reports, data, know-how, works-in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information, and trade secrets; (v) any other information that should reasonably be recognized as confidential information of Emerald and Mr. de'Medici; and (vi) any information generated by Beck or Advanced Strategies or by their representatives that adapts, is created from, contains, is derived from, improves, modifies, reflects, relates to, varies from, or in any manner originated out of or from the confidential information, in whole or in part, or is derived from any of the foregoing**.**

92. The Trade Secrets are "confidential information" within the meaning of the NDA.

93. The NDA requires that Beck and Advanced Strategies limit disclosure of any confidential information to only those who have a need to know in connection with the TDM Solar Venture, advise those who receive the confidential information of the proprietary nature of the information, keep all confidential information strictly confidential, and not disclose any confidential information received by them to any third parties.

94. The NDA further requires that Beck and Advanced Strategies only use the confidential information in connection with the TDM Solar Venture and not for any other purpose.

95. By signing the NDA, Beck and Advanced Strategies acknowledged that the confidential information to be disclosed in connection with the TDM Solar Venture is of a unique and valuable character, and that the unauthorized dissemination of the confidential information would destroy or diminish the value of such information.

96. Mr. de'Medici and Emerald adhered to their obligations under the NDA.

97. Beck and Advanced Strategies breached their obligations under the NDA by, among other things: disclosing the Trade Secrets to Solar Landscape to help Solar Landscape obtain financing for solar energy projects; using the Trade Secrets to form SolarGator, Beck's own solar energy firm; and, upon information and belief, disclosing Trade Secrets to additional third parties in violation of the NDA.

98. As a direct and proximate result of Beck's and Advanced Strategies' breaches, Mr. de'Medici and Emerald have suffered significant monetary damages.

WHEREFORE, Plaintiffs pray that a judgment be entered in their favor and against Beck and Advanced Strategies, and that the Court issue an award of compensatory damages in an amount to be proven at trial and any further and additional relief the Court deems to be proper and just.

## COUNT IV: PROMISSORY ESTOPPEL
## (Beck, Advanced Strategies)

99. Plaintiffs re-state and re-allege paragraphs 1 through 68 as if fully set forth herein.

100. After meeting Mr. de'Medici in April 2024, Beck promised that he could and would secure $500,000 in funding for the TDM Solar Venture.

101. Beck made the promise to Mr. de'Medici with the expectation that Mr. de'Medici would rely on the promise.

102. Mr. de'Medici did, in fact, rely on Beck's promise to obtain $500,000 in funding for the TDM Solar Venture. For example, Mr. de'Medici continuously shared his Trade Secrets with Beck because Beck represented to Mr. de'Medici that sharing those materials was necessary to obtain the promised funding, and that Beck understood and intended to abide by the terms of their signed NDA. Additionally, on July 15, 2024, Mr. de'Medici quit his job at Reactivate in reliance on Beck's promise that Beck had all but finalized the receipt of the $500,000 in funding. This reliance was definite and substantial in nature.

103. Mr. de'Medici's reliance on Beck's promise that Beck would obtain the $500,000 in funding was reasonable. Beck was a participant in the prestigious EnGen program, and Beck represented to Mr. de'Medici that Beck had significant experience in both the energy industry and in securing funding for energy-related startup ventures.

104. Beck did not follow through on his promise to obtain the $500,000 in funding for Mr. de'Medici. Beck also failed to follow through on additional promises to obtain other investors in the TDM Solar Venture.

105. As a direct and proximate result of Beck's failures to secure the $500,000 in funding promised to Mr. de'Medici, Mr. de'Medici suffered damages. Specifically, Mr. de'Medici lost his job at Reactivate, and he was unable to get the TDM Solar Venture off the ground because of the lack of funding. Additionally, because of Beck's actions, Mr. de'Medici and Ion have been unable to actualize the originally identified and intended project pipeline.

106. Beck's acts and omissions were oppressive, fraudulent and done with malice, justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray that a judgment be entered in their favor and against Beck and Advanced Strategies, and that the Court issue an award of: (a) compensatory damages in an

amount to be proven at trial; (b) punitive damages; and (c) any further and additional relief the Court deems to be proper and just.

**COUNT V: UNJUST ENRICHMENT**
**(All Defendants)**

107. Plaintiffs re-state and re-allege paragraphs 1 through 68 as if fully set forth herein.

108. From April to August 2024, Mr. de'Medici rendered a measurable benefit to Beck and Advanced Strategies at Beck's express or implied request. Specifically, Mr. de'Medici repeatedly shared Trade Secrets with Beck under the pretense that Beck was using those Trade Secrets to obtain funding for the TDM Solar Venture. Mr. de'Medici also shared his own industry expertise and research with Beck when Beck requested such information for "personal use."

109. In exchange for sharing the Trade Secrets with Beck and Advanced Strategies, Mr. de'Medici expected payment from Beck and Advanced Strategies. Specifically, Mr. de'Medici expected to obtain at least $500,000 in funding from investors that Beck and Advanced Strategies said they were actively seeking for the benefit of the TDM Solar Venture.

110. Beck and Advanced Strategies used the Trade Secrets and other information from Mr. de'Medici to develop a separate solar energy startup, SolarGator, and to help obtain funding for other solar energy companies. Upon information and belief, SolarGator has achieved significant financial success, which is directly attributable to the unauthorized use of the Trade Secrets by Beck and Advanced Strategies. Beck, as a founding member and manager of SolarGator, has obtained a direct financial benefit from SolargGator's success.

111. Allowing Beck, Advanced Strategies and SolarGator to retain the financial benefits they obtained through the unauthorized use of the Trade Secrets without restitution to Mr. de'Medici would be unjust.

112. Beck's, Advanced Strategies' and SolarGator's acts and omissions were oppressive, fraudulent and done with malice, justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray that a judgment be entered in their favor and against Defendants, and that the Court issue an award of: (a) compensatory damages in an amount to be proven at trial; (b) punitive damages; and (c) any further and additional relief the Court deems to be proper and just.

**COUNT VI: BREACH OF FIDUCIARY DUTY**
**(Beck, Advanced Strategies)**

113. Plaintiffs re-state and re-allege paragraphs 1 through 68 as if fully set forth herein.

114. In April 2024, Beck and Mr. de'Medici met at the EnGen program, and Beck offered to secure approximately $500,000 in funding for the TDM Solar Venture.

115. Beck and Mr. de'Medici had a verbal agreement that Beck would work on Mr. de'Medici's behalf to secure $500,000 in funding for the TDM Solar Venture. Accordingly, Beck was an agent for Mr. de'Medici and Emerald with respect to obtaining the promised funding.

116. As Mr. de'Medici's and Emerald's agent, Beck owed Mr. de'Medici the fiduciary duties of good faith, loyalty and trust.

117. Beck breached his fiduciary duties of loyalty, good faith and trust by extracting the Trade Secrets from Mr. de'Medici and Emerald and using the Trade Secrets for his own benefit rather than for the purpose of obtaining funding for the TDM Solar Venture.

118. Specifically, Beck persuaded Mr. de'Medici to continue to share the Trade Secrets under the guise that the receipt of those Trade Secrets was necessary to secure the promised funding. All the while, upon information and belief, Beck was using the Trade Secrets to form his own solar venture, SolarGator, and to develop a business partnership with Solar Landscape.

119. As a direct and proximate result of Beck's breaches, Mr. de'Medici and Emerald suffered damages. Neither obtained the promised funding, and the Trade Secrets have lost the value they previously had to Mr. de'Medici and Emerald because they have been shared with and used by SolarGator, Solar Landscape and unknown additional third-parties.

WHEREFORE, Plaintiffs pray that a judgment be entered in their favor and against Beck and Advanced Strategies, and that the Court issue an award of: (a) compensatory damages in an amount to be proven at trial; (b) punitive damages; and (c) any further and additional relief the Court deems to be proper and just.

Dated: July 31, 2026

Respectfully submitted,

*/s/ Katie A. O'Neill*

Katie A. O'Neill
**O'NEILL LAW LLC**
125 S. Clark St., Suite 1700
Chicago, IL 60603
(312) 242-2002
katie@olawlit.com

*Attorneys for Plaintiffs Tomás de'Medici, TdM Emerald and Ion Stewards Energy*